**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Linda M. Thunberg, | ) | CASE NUMBER: 19-31049 |
| | ) | CHAPTER 13 |
| DEBTOR, | ) | |
| | ) | |
| A. Cotton Wright, | ) | |
| Trustee for Linda M. Thunberg | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VERSUS | ) | ADVERSARY CASE NUMBER |
| | ) | 19-03055 |
| Gary Brett Dobson | ) | |
| | ) | |
| DEFENDANT. | ) | |

**ANSWER**

Now comes Defendant Gary Brett Dobson("Defendant"}, by and through counsel, answering Plaintiff and states as follows:

(1) The allegations of paragraph 1 of the Plaintiff's Complaint are admitted.

(2) The allegations of paragraph number 2 of the Plaintiff's Complaint are admitted in that the petition does list the Home and the boat on schedule A/B.

(3) The allegations of paragraph number 3 of the Plaintiff's Complaint are admitted.

(4) The allegations of paragraph number 4 of the Plaintiff's Complaint are admitted.

(5)  Upon information and belief, the allegations of paragraph number 5 of the Plaintiff's Complaint are admitted.

(6) The allegations of paragraph number 6 of the Plaintiff's Complaint are admitted.

(7) The allegations of paragraph number 7 of the Plaintiff's Complaint are denied. The Property at issue in this matter should be distributed via state court equitable distribution and as such this Court does not have authority to enter a final order as to the Plaintiff's claims.[1]

(8) The allegations of paragraph number 8 of the Plaintiff's Complaint are admitted in that venue is appropriate.

(9) The allegations of paragraph number 9 of the Plaintiff's Complaint are admitted in that the Deed to the real property does list the Debtor's name.

(10) The allegations of paragraph number 10 of the Plaintiff's Complaint are denied in that the Debtor used deceitful and fraudulent means to obtain the title to the real property in her sole name while she was married to the Defendant and used separate property of the Defendant to do so. It was not the intention of the parties for the home to be titled solely to the Debtor.

(11) The allegations of paragraph number 11 of the Plaintiff's Complaint are admitted.

---

[1] <u>Stern v. Marshall,</u>  564 U.S. 462, (2011)

(12) The allegations of paragraph number 12 of the Plaintiff's Complaint are admitted.

(13) The allegations of paragraph number 13 of the Plaintiff's Complaint are admitted.

(14) The allegations of paragraph number 14 of the Plaintiff's Complaint are admitted.

(15) The allegations of paragraph number 15 are admitted in that the Defendant initiated equitable distribution proceedings against the Debtor in large part due to her deceitful and fraudulent actions to attempt to wrongfully take property from Defendant.

(16) The allegations of paragraph number 16 of the Plaintiff's Complaint are admitted. Defendant claims that both the real property and boat at issue in this matter are his separate property under North Carolina law.

(17) The allegations of paragraph number 17 do not require a response

(18) The language of 28 USC 2201(a) speaks for itself.

(19) The allegations of paragraph number 19 are admitted in that the Defendant contends that both the real property and the jointly titled boat are the separate property of the Defendant under North Carolina law.

(20) Section 502 of the Bankruptcy Code speaks for itself.

(21) The holding of Beckhart, speaks for itself.

(22) The allegations of paragraph number 22 are admitted in that the Debtor fraudulently and through deceptive means took sole title of the real property without the knowledge of Defendant. This in part, led eventually to the divorce of the Debtor and Defendant and equitable distribution action that is now on hold in state court.

(23) The allegations of paragraph number 23 are admitted in that the Debtor engaged in a number of deceitful and malicious acts including acting behind the Defendant's back to ensure title to the real property was placed in her name.

(24) The allegations of paragraph number 24 of the Plaintiff's Complaint are denied.

(25) The allegations of paragraph number 25 of the Plaintiff's Complaint do not require a response.

(26) The allegations of paragraph number 26 of the Plaintiff's Complaint are admitted in that section 363(h) of the Bankruptcy Code speaks for itself. The rest of the allegations are denied in that under North Carolina law, the real property and boat are the separate property of the Defendant.

(27) Section 363(j) of the Bankruptcy Code speaks for itself.

(28) The allegations of paragraph 28 of the Plaintiff's Complaint are denied in that the real property is the sole,

separate property of the Defendant.

(29) The allegations of paragraph 29 of Plaintiff's Complaint are admitted in that the Trustee does take the place of the Debtor's ownership interest. Defendant contends that the Debtor has no ownership interest under North Carolina law.

(30) The allegations of paragraph 30 of Plaintiff's Complaint are denied in that the Debtor and estate have no interest in the real property.

(31) The allegations of paragraph 31 of Plaintiff's Complaint are denied in that the Defendant owns the only legal and equitable interest in the home under North Carolina law.

(32) The allegations of paragraph 32 of Plaintiff's Complaint is admitted in that there would be great injustice to the Defendant if the real property is sold as he is the sole legal owner of the home under North Carolina law.

(33) The allegations of paragraph 33 of Plaintiff's Complaint are admitted. The Defendant uses the real property as his primary and only residence, which was purchased through separate funds he obtained prior to his marriage.

(34) The allegations of paragraph 34 of Plaintiff's Complaint are denied.

(35) The allegations of paragraph 35 of Plaintiff's

Complaint do not require a response.

(36) Section 363(h) of the Bankruptcy Code speaks for itself.

(37) Section 363(j) of the Bankruptcy Code speak for itself.

(38) The allegations of paragraph 38 of Plaintiff's Complaint are admitted in that the title displayed both the Debtor's and Defendant's names but Defendant contends that the boat is his separate property under North Carolina law.

(39) The allegations of paragraph 39 of Plaintiff's Complaint are admitted in that a Trustee does succeed in ownership to property of a debtor, but Defendant contends that Debtor has no legal interest in the property under North Carolina law.

(40) The allegations of paragraph 40 of Plaintiff's Complaint is admitted in that it is impractical to partition the boat because the Debtor has no legal interest under North Carolina law.

(41) The allegations of paragraph 41 of Plaintiff's Complaint are admitted in that a sale free and clear of Defendant's interests would net a better profit for the estate, but Defendant maintains the boat is his sole property.

(42) The allegations of paragraph 42 of Plaintiff's Complaint are denied. The boat is the sole property of the

Defendant. Selling the boat for Debtor's nonexistent ownership interest under North Carolina law would constitute a grave injustice.

(43) The allegations of paragraph 43 of Plaintiff's Complaint are admitted.

(44) The allegations of paragraph 44 of Plaintiff's Complaint are denied.

By way of further answer, defense, and claim, Defendant states as follows:

(1) Prior to his marriage to the Debtor, Defendant was the owner of Gary Dobson and Associates, LLC.

(2) Through this company, Defendant developed and sold intellectual property to USC Consulting Group on September 29, 2011 for $300,000.00. This was completely the result of Defendant's work and development.

(3) In August of 2012, Defendant purchased the Sea Ray 280 and paid cash for the boat with funds from his company account.

(4) In January of 2013, Debtor insisted that the Defendant add her name to the boat registration card in case she was operating the boat in his absence. At this point, the Defendant had no reason to distrust the Debtor as they were nearing marriage, so he agreed to do so.

(5) On March 22, 2013, the Debtor and Defendant were

married.

(6) In the first half of 2015, the Debtor and Defendant initiated the process to purchase the real property at issue in this matter.

(7) A Five Thousand ($5,000.00) check was written from the Defendant's business account containing the Defendant's separate funds and paid into escrow to the benefit of the sellers of the real property.

(8) The closing of the home was set for the first week of July, 2015 when Defendant was set to return from a business trip.

(9) Without the knowledge of the Defendant, the Debtor coordinated to have the closing moved to June 25, a day she knew Defendant would not be present. She further reported to the closing attorney's office that the title would be in her name alone.

(10) The closing occurred on June 25, 2015, where Debtor obtained the real property in her sole name while the Defendant was in Pennsylvania. The funds used for the closing were from the business account holding the separate funds the Defendant earned before being married. The Debtor, without the Defendant's knowledge wrote two checks from the Defendant's business account to herself personally. The checks were for $299,000.00 and $1,000.00 respectively. She then used this money for the home

purchase to make it appear as if she was purchasing the funds with her own money (see checks attached as Exhibit 1).

(11) When Defendant returned to North Carolina, he learned that the closing occurred without him and he confronted the Debtor about what she did. This began the rapid decline of the relationship that eventually led to the divorce.

(12) After the move to Wilmington, Defendant had a heavy work travel schedule and relied on the Debtor to ensure the business expenses were paid. His travel required him to be away from the home for the majority of each week.

(13) In January of 2016, Defendant noticed that all of his credit cards were maxed out, even though the records showed that all of Defendant's accounts receivables had been paid.

(14) In preparing his tax return for 2015, the Defendant noticed that the business operating account was significantly short of money and the credit cards were only receiving minimum payments.

(15) The Defendant confronted the Debtor about this, who in return became abusive towards the Defendant. Due to the mess the financial records were in and the Defendant's heavy travel schedule forced the Defendant to file for an extension to file his tax returns that year.

(16) The Defendant was further delayed due to Hurricane Matthew and eventually worked to get the records together in January of 2017. This is where Defendant learned that the Debtor intentionally opted out of paper statements so that it was extremely difficult for the Defendant had to work hard to discover the money she was stealing.

(17) In June of 2016, the credit cards were maxed out. This led the Defendant to discover that the money in the business accounts was nearly gone, although records confirmed that all of his clients were paying their invoices to him.

(18) Defendant then learned that the Debtor was taking money out of the account to pay her own personal and separate expenses and bills.

(19) After this confrontation, the Defendant changed all of the passwords and cut off her online access to the business account. The Debtor became physically abusive, and left the home in a hurry taking with her his company checkbook. She went directly to his bank and cashed a check which she signed withdrawing $5,000.00 from the account.

(20) Defendant went to see the bank manager, got copies of the cashed check and threatened to file charges of theft if Debtor did not return the money. After about four days Debtor provided to deposit slips totaling $5000 claiming she had returned the money and the matter was dropped. The bank manager

made notes to this effect.

(21) It was only later that it was realized that the Debtor had engaged in a masterful system of transferring, withdrawing, and depositing funds into multiple accounts, that it took a significant amount of time for me to track the and piece together the transactions the Debtor had completed.  So not only had she paid the $5000 back with money she had stolen from the company account, she had stolen more than the $5000.

(22) The Defendant removed all access the Debtor had to the account, but he was too late to stop the $5,000.00 check from being cashed.

(23) In March 2017 the Debtor took advantage of the Defendant's medical condition and medication he was taking to have him hospitalized against his will. While he was hospitalized, she cleaned out both his company and personal bank accounts by transferring money between accounts, Paying her company and personal bills and using the remaining balances of the Defendant's credit cards to pay legal fees to file for divorce and restraining order.

(24) The Debtor claimed that she was abused by the Defendant and had him hospitalized for alleged drug abuse and suicide threats. The Debtor was drug tested and no illegal or non-prescription drugs were found in his system. He was then transported to a psychiatric ward for observation.

(25) While he was in observation, Defendant was served with a summons for divorce and a restraining order.

(26) Two days later, the Defendant was released. He was allowed to retrieve some of his belongings that were placed in the driveway by the Debtor. He went to withdraw money from the ATM and learned all accounts were emptied and ended up having to secure a hotel room using accrued points; otherwise he would have been homeless.

(27) The next day, Defendant met with the Bank manager at his local branch to discuss the transactions executed by the Debtor. After this discussion Linda was removed as a signer from both of Gary's bank accounts and Gary was assured that there was no way she could remove the funds.

(28) Within a couple of days Linda withdrew $1200 by cashing 2 checks at a different Branch. BB&T initiated Fraud Charges against Linda. Linda provided Deposit slips to show she had put the money back.

(29) Within the next month, the state court family law attorney for the Debtor withdrew all legal proceedings including the restraining order that was initiated on behalf of the Debtor.

(30) During the time that the Defendant was in the hospital and was out of the home, the Debtor destroyed Defendant's business and tax records and destroyed his computer and backup

hard drives. The records the Defendant does have make it clear that the Debtor did take money from Defendant's business accounts to pay her separate business expenses.

(31) The Debtor initiated a proceeding for absolute divorce and Defendant filed to initiate equitable distribution proceedings. Debtor eventually filed for Chapter 7 protection in a bad faith attempt to have the Bankruptcy Court decide that the separate property of the Defendant belonged to her as she learned that the law in North Carolina would declare the home and boat as belonging to the Defendant. The Debtor intentionally worked to delay proceedings, even feigning an attempt to settle with the Defendant.

(32) Prior to filing for divorce, the Debtor had friends assist her with packing up the belongings and furniture that she claimed. After confirming that she had what she was taking, she and her friends loaded the items on a moving truck and left the home; claiming she would not return.

(33) On that same day, the Defendant met a friend for lunch and suffered a heart attack and was hospitalized. When he was released and returned home, he learned that the Debtor returned and took everything from the home; even items that she claimed she was leaving to the Defendant. She even caused significant damage to the walls and other areas of the home during her move out.

(34) The Debtor then took actions to lock the Defendant out of the home security system before he had a chance to secure it, turned off the utilities and closed the personal bank account.

(35) The Debtor has continued to engage in harassing and malicious behavior such as stealing mail from the mailbox when she is in town; locking the debtor out of utilities accounts making it difficult to maintain the utilities for the home; and continuing to contact the Debtor directly and send threatening messages, although she was told to only contact his attorney.

(36) The Defendant contends and is supported by North Carolina law, specifically N.C.G.S. § 50-20(b)(2), that the Real Property and Boat at issue in this case are his separate property and are not property of the estate pursuant to 11 USC § 541(d).

(37) Contemporaneous with the filing of this answer, Defendant is filing a Third-Party Complaint against the Debtor in this matter seeking the non-dischargeability of his claims as well as other claims.

**MOTION TO STAY PROCEEDINGS**

(38) All previous paragraphs are hereby incorporated by reference and re-alleged as if fully set forth herein.

(39) Prior to the filing of the base bankruptcy case by the Debtor, the Defendant and Debtor were engaged in a State Court

Equitable Distribution Suit.

(40) Federal law recognizes that matters of Equitable Distribution should be heard only by the State Courts and not the Federal Courts.[2]

(41) Under North Carolina law, the Debtor does not have any equitable ownership interest in the real Property or the Boat for the Trustee's strong-arm powers to take possession of.

(42) This matter should be stayed until the completion of the state court Equitable Distribution matter and then brought back to this court for final review. The grounds to lift the stay pursuant to 11 USC 523(d) have been met.

## MOTION TO DISMISS

(43) All previous paragraphs are hereby incorporated by reference and re-alleged as if fully set forth herein.

(44) Prior to the filing of the base bankruptcy case by the Debtor, the Defendant and Debtor were engaged in a State Court Equitable Distribution Suit.

(45) Under North Carolina law, the Debtor has the only equitable and true ownership interest in both the Boat and the Real Property at issue in this matter.

(46) NCGS § 50-20(b)(2) states

> ""Separate property" means all real and personal property acquired by a spouse before marriage or acquired by a spouse by devise, descent, or gift

---

[2] Perlow v. Perlow, 128 B.R. 412, (1991) citing In re McDonald, 755 F.2d 715 at 719, (9th Cir. 1985)

during the course of the marriage. However, property acquired by gift from the other spouse during the course of the marriage shall be considered separate property only if such an intention is stated in the conveyance. Property acquired in exchange for separate property shall remain separate property regardless of whether the title is in the name of the husband or wife or both and shall not be considered to be marital property unless a contrary intention is expressly stated in the conveyance. The increase in value of separate property and the income derived from separate property shall be considered separate property. All professional licenses and business licenses which would terminate on transfer shall be considered separate property"

(47) The Boat was owned by Debtor prior to the marriage between the parties. While the title was changed to later add the Debtor, but no specific intention was mentioned in the conveyance to defeat the fact that the boat remains Defendant's separate property.

(48) The Real Property was purchased using funds that belonged solely as the separate property of the Defendant. It has been alleged that the Debtor acted in bad faith and with malicious intent to put the property into her name alone. Nothing in any conveyance documents indicates that the Defendant intended for the funds used towards the purchase of the home to be treated as marital property or the Debtor's sole property; especially since the Debtor took the money without the Defendant's knowledge.

(49) This is a matter that arises under state law and should be decided by state court as to if the Boat and Real

- 16 -

property are the martial property of the Debtor and Defendant, or the separate property of the Defendant and as such this court lacks Subject Matter jurisdiction pursuant to Federal Rule of Civil procedure 12(b)(1) as made applicable to this matter by Federal Rule of Bankruptcy procedure 7012.

(50) The Defendant does not consent to the Bankruptcy Court entering a Final Judgment in this matter until the equitable distribution rights between the Debtor and Defendant are established.

(51) Therefore, based on the Court's lack of subject matter jurisdiction unless the State Court deems that the Boat and Real Property are the marital property of the Debtor, the Court lacks the ability to hear this matter pursuant to FRCP Rule 12(b)(1).

## COUNTERCLAIM
## CLAIM AGAINST THE ESTATE

(52) All previous paragraphs are hereby incorporated by reference and re-alleged as if fully set forth herein.

(51) Pursuant to 11 USC 544, the Trustee stands as a lien creditor or bona fide purchaser of property of the estate.

(52) This requires that the Trustee take this position without knowledge of any claim to property of the estate.

(53) When the case was filed, the Debtor and Defendant were

engaged in an Equitable Distribution suit to determine the split of all property they held.

(54) The Trustee was placed on notice of the claims of the Debtor and Defendant and the Defendant's claim that the Real Property and Boat were his separate property; a contention that is supported by the plain language of North Carolina law.

(55) If the Trustee is permitted to sell the Boat and Real Property, the Defendant is entitled to a priority claim on the value of the property that would constitute what the state court would deem to be his separate property not reachable by the Bankruptcy Estate.

(56) Pursuant to 11 USC 541(d), the Boat and Real Property, clearly being separate property of the Defendant, are not property of the estate for the Trustee's strong-arm powers to reach.

(57) Therefore, the Defendant is entitled to a judgment against the Estate in the amount equal to the value of his separate property, if the Boat and Real property are permitted to be sold by the Estate.

Wherefore the Defendant, having responded to each and every paragraph and subparagraph of the Plaintiff's Complaint, the Defendant respectfully prays the Court as follows:

(1) The Court find in favor of the Defendant, and stay this

action until the Equitable Distribution matter is decided by the State Court;

(2) That the Court dismiss this action to the extent the Trustee desires to sell the separate property of the Defendant;

(3) That pursuant to Defendant's counterclaim, that the Court award the Defendant a judgment against the Estate and a priority claim against the Estate, in the amount equal to the value of his separate property if such property is allowed to be sold by the Trustee;

(4) The costs of this action be taxed to the Plaintiff.

(3) For such other and further relief as the Court deems just and proper.

This the 27th day of September, 2019

/S/ Kenneth Love
Kenneth Love
Karrenstein and Love, PLLC
10590 Independence Pointe Pkwy
Suite 200
Matthews, NC 28105
704-364-6464
704-364-6466

**CERTIFICATE OF SERVICE**

---

    I, Kenneth Love, attorney for the Defendant hereby certify that on September 27, 2019, I served a copy of the Defendants' Answer on all parties in interest by depositing a copy thereof in a Post office or Official Depository under the exclusive care and custody of the United States Post Office properly addressed and with adequate postage thereon to said parties as follows:

Anna S. Gorman
Attorney for Trustee
Grier Wright Martinez PA
101 N. Tryon St, Ste 1240
Charlotte, NC 28246

A. Cotten Wright
Trustee
Grier Wright Martinez PA
101 N. Tryon St, Ste 1240
Charlotte, NC 28246

Kimberly Sheek
Attorney for Debtor
The Law Office of Kimberly A. Sheek
1931 J N Pease Pl, Suite 202
P.O. Box 480740
Charlotte, NC 28269

Linda Thunberg
16870 Hugh Torance Pkwy
Huntersville, NC 28078


    This the 27th day of September, 2019.

*S/Kenneth Love*
_____
Kenneth Love